**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TIM CRAFT, individually and on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>BMW OF NORTH AMERICA, LLC, and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT,<br><br>        Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Tim Craft, individually and on behalf of all others similarly situated, brings this Complaint against BMW of North America, LLC and Bayerische Motoren Werke Aktiengesellschaft (collectively, "BMW" or "Defendants"). Plaintiff alleges the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief:

## INTRODUCTION

1. This consumer class action arises from a latent defect found in model year ("MY") 2017-2023 BMW M440i, M550i, X1, X3, X4, X5, X6, and X7, 330, 340i, and 750i vehicles (hereafter, the "Class Vehicles").[1]

2. This action arises from Defendants' failure, despite their longstanding knowledge, to disclose to Plaintiff and other consumers that the Class Vehicles contain a defectively designed and/or manufactured sealing that causes water infiltration through the roof-mounted shark fin

---

[1] Plaintiff reserves the right to amend the definition of the Class Vehicles after conducting discovery.

antenna. When the Defect manifests, the seams of the shark fin antenna infiltrate with water, which causes corrosion of interior electrical components, collection of water in body cavities, and water damage to the Class Vehicles' interior ("Sealing Defect" or "Defect").

3.      The Defect poses a danger to drivers and occupants of the Class Vehicles, and others who share the road with them, as water infiltration could result in the failure of vital safety equipment, including failure of the vehicle's emergency call system and other communication systems, and inaccurate readings of the Class Vehicles' Global Positioning System ("GPS").

4.      Not only did Defendants actively conceal the fact that the Class Vehicles were prone to the Defect, which could result in the failure of safety equipment and other dangerous situations, and require costly repairs, but they also did not reveal that the existence of the Defect would diminish the intrinsic and resale value of the Class Vehicles.

5.      Defendants have long been aware of the Defect. Despite their longstanding knowledge, Defendants have been unable or unwilling to adequately repair the Class Vehicles at no cost to consumers when the Defect manifests.

6.      Many owners and lessees of the Class Vehicles have communicated with Defendants and their authorized dealerships to request that they remedy and/or address the Defect at Defendants' expense. Defendants have failed and/or refused to do so, often conveying to owners and lessees that the Class Vehicles are operating as intended. Once the Class Vehicles fall outside the warranty period, Defendants then charge the owners and lessees for the costly repairs necessitated by the Defect.

7.      Defendants have also refused to take any action to correct this concealed Defect when it manifests in the Class Vehicles outside of the warranty period. Because the Defect can manifest shortly outside of the warranty period for the Class Vehicles—and given Defendants'

knowledge of this concealed, safety-related Defect—Defendants' attempt to limit the warranty with respect to the Sealing Defect is unconscionable and unenforceable here.

8.      As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, owners and lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value of their Class Vehicle. The unfair and deceptive trade practices committed by Defendants were conducted in a manner giving rise to substantial aggravating circumstances.

9.      Despite notice and knowledge of the Defect from the numerous complaints they have received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and their own internal records, including pre-sale durability testing, Defendants have not recalled and/or offered an adequate repair to the Class Vehicles, offered their customers suitable repairs or replacements free of charge, or offered to reimburse their customers who have incurred out-of-pocket expenses to repair the Defect.

10.     Had Plaintiff and other Class Members known of the Defect at the time of purchase or lease, they would not have bought or leased their Class Vehicles, or would have paid substantially less for them.

11.     Plaintiff is also informed and believes, and on that basis alleges, that as the number of complaints increased, and Class members grew dissatisfied with the performance of the Class Vehicles, Defendants were forced to acknowledge that the Class Vehicles suffer from an inherent defect.

12.     As a result of the Defect and the monetary costs associated with attempting to repair the Defect, Plaintiff and the Class have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.

13.     This case seeks protection and relief for owners and lessees of the Class Vehicles for the harm they have suffered and the safety risks they face from Defendants' breaches of express and implied warranties, Defendants' unfair, unlawful, and deceptive trade practices, and for common law fraud and unjust enrichment.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, a substantial part of the events or omissions giving rise to the claim occurred in this district, Defendants have advertised in this district, and Defendants have received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this district.

16.     This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the state of New Jersey and throughout the United States. Defendant BMW of North America, LLC also maintains its corporate headquarters in this district.

## THE PARTIES

**Plaintiff Tim Craft**

17.     Plaintiff Tim Craft is a citizen of California who currently resides in Thousand Oaks, California, and has at all times pertinent to this Complaint.

18.     Plaintiff Craft purchased a certified, pre-owned 2019 X5 xDrive 40i on April 29, 2023, from BMW of San Diego, an authorized BMW dealership located in San Diego, California.

19.     Plaintiff Craft purchased (and still owns) this vehicle, which is used for personal, and/or household use. His vehicle bears Vehicle Identification Number 5UXCR6CR59KLL37747.

20.     Prior to purchase, Plaintiff Craft discussed the features of the vehicle with BMW's sales representatives at BMW of San Diego and reviewed the vehicle's window sticker. None of these sources disclosed the Defect to Plaintiff Craft.

21.     Indeed, BMW's sales representatives told Plaintiff Craft that the vehicle had been thoroughly inspected by BMW of San Diego and was free from any issues.

22.     In March 2024, when Plaintiff Craft's vehicle had approximately 30,000 miles on the odometer, he noticed malfunctions in various features of his vehicle after a heavy rainstorm. First, his vehicle displayed a warning on the dashboard stating that emergency call system was malfunctioning. Second, the GPS navigation system incorrectly pinned his location, thereby preventing him from using the GPS system as intended. Third, the hands-free phone microphone located above the driver's seat was not functioning. Fourth, Plaintiff Craft experienced issues with the BMW Comfort Access system, which allows drivers to unlock the vehicle without a key by detecting when the driver is nearby and readying the vehicle's engine for an automatic start.

Plaintiff Craft noticed that the vehicle would intermittently crank but not start. All of these issues worsened over time.

23.     On May 14, 2024, Plaintiff Craft brought his vehicle to Rusnak BMW, an authorized BMW dealership located in Thousand Oaks, California. Rusnak BMW found water ingress into the telematics control module and recommended replacement, including replacement of the shark fin antenna. Rusnak BMW informed Plaintiff Craft that the necessary repairs were not covered under warranty and quoted him approximately $2,500. Plaintiff Craft objected to this quote, insisting he should not have to pay for the repairs because the shark fin antenna is defective. Ultimately, Plaintiff Craft paid $92 for the necessary repairs because he needed a safe and working vehicle.

24.     Plaintiff Craft has suffered an ascertainable loss as a result of Defendants' omissions associated with the Defect, including, but not limited to, out of pocket loss associated with the Defect and diminished value of his vehicle.

25.     Neither Defendants, nor any of their agents, dealers, or other representatives informed Plaintiff of the existence of the Defect prior to or after purchase. Had Defendants disclosed the Defect, Plaintiff Craft would have seen the disclosure, and he would not have purchased his vehicle, or would have paid less for it.

**<u>Defendants</u>**

26.     Defendants are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States. Furthermore, Defendants design, develop, manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles, including the Class Vehicles.

27.     Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW-GER") is a corporation organized and existing under the laws of Germany, with its principal place of business located in Munich, Bavaria, Germany. BMW-GER is the parent corporation of BMW of North America, LLC.

28.     Defendant BMW of North America, LLC ("BMW-NA") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 300 Chestnut Ridge Road in Woodcliff Lake, New Jersey. BMW-NA is BMW-GER's U.S. sales and marketing division, which oversees sales and other operations across the United States. BMW-NA distributes BMW vehicles and sells these vehicles through its network of dealers. Money received from the purchase of a BMW vehicle from a dealership flows from the dealer to BMW-NA.

29.     BMW-NA and BMW-GER sell BMW vehicles through a network of dealerships..

30.     Upon information and belief, Defendant BMW-GER communicates with Defendant BMW-NA concerning virtually all aspects of the BMW products it distributes within the United States.

31.     Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation, and decisions regarding the Class Vehicle sealing, as it relates to the Defect, were performed exclusively by Defendants BMW-NA and BMW-GER.

32.     Upon information and belief, Defendants BMW-NA and BMW-GER developed the post-purchase owner's manuals, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles.

33.     Defendants also jointly design, determine the substance of, and affix to BMW vehicles the window stickers visible on every BMW vehicle offered for sale at their authorized

dealerships. Defendants control the content of these "Monroney" stickers—their authorized dealerships have no input with respect to their content. Vehicle manufacturers like Defendants are legally required to affix a window sticker to every vehicle offered for sale in the United States pursuant to the Automobile Information Disclosure Act of 1958, 15 U.S.C. §§ 1231, *et seq*., which, among other things, prohibits the removal or alteration of the sticker by anyone other than the ultimate purchaser prior to the sale of the car, including the dealership at which the vehicle is offered for sale.

34.     BMW-NA and BMW-GER are collectively referred to in this complaint as "BMW" or "Defendants" unless identified separately.

35.     BMW engages in continuous and substantial business in New Jersey.

36.     Based upon information and belief, Plaintiff alleges that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each other, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each other. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each Defendant.

## **TOLLING OF STATUTES OF LIMITATION**

37.     Any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff and members of the Class could not have reasonably discovered the true, latent nature of the Defect until shortly before this class action litigation was commenced.

38.     Defendants were and remain under a continuing duty to disclose to Plaintiff and members of the Class the true character, quality, and nature of the Class Vehicles, that the Defect is a safety-related defect, and that it diminishes the resale value of the Class Vehicles. As a result

of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

### A.  The Roof-Mounted Shark Fin Antenna in the Class Vehicles

39.     The Class Vehicles, like most modern automobiles, utilize a roof-mounted antenna to receive and transmit wireless signals and radio waves for use in emergency calls, GPS navigation, and other communications systems. The antenna captures cellular, GPS, and satellite radio signals and converts those transmissions into electrical signals that travel through wires in the Class Vehicles.

40.     One feature in the Class Vehicles that utilizes the antenna is the BMW Intelligent Emergency Call system. In an emergency, such as a crash, the service utilizes the antenna to pinpoint and send the location of the vehicle along with other relevant information to the BMW Assist response center. A response specialist then contacts police and/or emergency medical technician services and directs resources to the location identified by the antenna. To activate, owners press an SOS button located above the rear-view mirror. A green LED light will illuminate, indicating that a response specialist is waiting to speak through the Class Vehicle's cellular functions to determine what help is needed. Owners can manually activate the SOS button for emergencies such as a flat tire or an empty fuel tank. The Intelligent Emergency Call system also activates automatically in serious emergencies, such as a collision, where the driver may not be able to reach the SOS button.

41.     In the Class Vehicles, the antenna's equipment and electrical components are housed within a roof-mounted carbon fiber structure shaped like a shark's fin, distinct from the

pole-like design featured in more traditional vehicle models. A diagram depicting the general structure of a shark fin antenna is included below as background:



42.     The shark fin structure is attached to the roof of the Class Vehicles using a sealing and paint application process. Proper sealing prevents water from infiltrating the seams of the antenna structure and into the vehicle's interior during events like rainstorms, snowstorms, and car washes.

43.     If the antenna is not properly sealed, water may infiltrate the antenna structure at the seams and come into contact with the equipment therein, exposing electrical components to water while also causing damage to the vehicle's interior.

44.     When exposed to water, the electrical components corrode, compromising the vehicle's ability to receive and transmit signals. Without properly functioning electrical components in the antenna, the Intelligent Emergency Call system will not function properly, posing a substantial safety threat to owners, passengers, and other drivers.

45.     Additionally, water infiltration causes system malfunctions or system failures related to the telematics control box, which is responsible for GPS navigation, radio, and other communications systems. The telematics control box is shown below:



**B.   The Sealing Defect**

46.     Because the shark fin antenna structure houses the electrical components for vital safety equipment in the Class Vehicles, it is imperative that the sealing on the structure is robust enough to repel water from rainstorms, snowstorms, and car washes.

47.     The electrical components themselves, housed within and beneath the antenna structure, are not waterproof. Thus, any manufacturing and/or design defect in the seal may allow water to infiltrate, causing the electrical systems to malfunction and/or fail.

48.     The sealing and paint application process in the Class Vehicles suffers from one or more design and/or manufacturing defects that causes the shark fin antenna structure to detach from the roof of the Class Vehicles, allowing water to infiltrate the antenna at the seams and leak

into the interior of the vehicle. This causes the electrical components housed within and adjacent to the structure to corrode, and as a result the systems malfunction or fail.

49.     Once a leak occurs, it is only a matter of time until water infiltration corrodes the electrical components and damages to the vehicle's interior. Water infiltration can only be remedied by resealing the antenna to the roof of the Class Vehicles.

50.     Symptoms of the Defect include an alarm and corresponding warning message on the Class Vehicle's dashboard that reads: "Emergency call system malfunction," as shown below:



51.     The loss of functionality of the emergency system poses a safety risk to Class Vehicle owners, passengers, and other drivers because the vehicle may not be able to contact the BMW Assist response center in the event of an emergency.

52.     Owners may also experience unneeded automatic activation of the Intelligent Emergency Call System, which alerts the BMW Assist response center of an emergency where none has occurred. When the system is activated, the center display screen functions are replaced

by an SOS message, and all other functions are inoperable for several minutes while the vehicle

contacts the BMW Assist response center, distracting the driver of the vehicle.

53.     When the Defect manifests in the Class Vehicles, other electrical systems

malfunction and/or fail, including Bluetooth connectivity services, satellite radio and cellular

communication systems, and the GPS navigation system.

54.     Further, water infiltration as a result of the Defect may cause mold growth in the

vehicle's interior, including in areas not visible to the owner or passengers in the Class Vehicle.

55.     According to the terms of the New Vehicle Limited Warranty, sealing and paint

layers are not maintenance items and, as such, should last for the useful life of the Class Vehicles.

Plaintiff and Class members' experiences demonstrate that the sealing fails well before the end of

the useful life of the Class Vehicles. Despite this, Defendants do not cover the costs for necessary

repairs. The cost of such repairs range from $2,000 to $5,000.

**C.  Defendants' Knowledge of the Sealing Defect**

56.     Upon information and belief, Defendants regularly monitor the NHTSA databases

as part of their ongoing obligation to identify potential defects in their vehicles. Examples of the

complaints about Class Vehicles can be found below. The below sources establish that Defendants

knew, or should have known, of the Defect based on publicly available information through

(1) Defendants' own records of customers' complaints, (2) dealership repair records, (3) records

from NHTSA, (4) warranty and post-warranty claims, (5) pre-sale durability testing and part sales,

and (6) other various sources.

**1.  Defendants' Pre-Sale Testing and Quality Control Measures**

57.     Defendants tout their quality efforts to the public:

BMW carries the symbolic message in its very name: the M in the middle of the
acronym stands for "Motoren," or engines. It stands for the beginning of the

company, and for engine technology of the highest standard over many decades and for various means of transport. Be it for a plane, a motorcycle or an automobile, BMW pioneers new technologies.[2]

58.    Defendants also tout that their slogan "Sheer Driving Pleasure" has been synonymous with the "BMW driving experience" for over half a century.[3] Describing the meaning of its slogan, Joachim Blickhäuser, Head of Corporate and Brand Identity at the BMW Group, states it "describes the essence of the brand, which is very robust, resilient and future-oriented."[4]

59.    BMW states that its "[d]esigners have to understand far in advance what will be regarded as modern and cutting-edge in tomorrow's world – and how BMW customers' needs may have changed by then."[5]

60.    It also employs "state-of-the-art digital technologies . . . in the design process. From two-dimensional sketches, CAS (computer-aided styling) designers create a virtual three-dimensional vehicle. Among other things, they use Virtual Reality."[6]

61.    Prof. Dr. Rudolf C. Stauber, the departmental manager of the engineering strength and materials department at the BMW Group, stated that "[l]ightweight construction, optimal use of materials, quality assurance and many other factors have significantly increased the requirements for engineering strength. Moreover, the importance of the predicted service life of a vehicle has also increased considerably in recent years."[7] Accordingly, BMW knows that its

---

[2] https://www.bmw.com/en/innovation/outstanding-bmw-engine-models.html (last visited June 7, 2024).

[3] https://www.bmw.com/en/automotive-life/the-history-of-the-bmw-slogan.html (last visited June 7, 2024)..

[4] *Id.*

[5] https://www.bmw.com/en/design/car-design-in-7-steps.html (last visited June 7, 2024).

[6] *Id.*

[7] https://www.reliableplant.com/Read/7711/bmw-takes-auto-components-to-limit-during-testing (last visited June 7, 2024).

customers expect the service life of their vehicles to last and crucial components central to the safety and functionality of the vehicle are not expected to fail in the first few years of ownership.

62.     BMW subjects its vehicles to a special "vehicle load analysis vehicle" nicknamed FABEAN. This process is explained as follows:

> During the early design phase, numerical simulation plays an important role. As part of the virtual road load measurement process, a vehicle is driven over measured and digitalized real road sections, allowing maximum vehicle loads to be determined at a very early stage. The derived wheel strengths are then supplemented with measurements from the predecessor model. As soon as the designs of the first axles become available during the design phase and the rigidity of the body is determined, a special "vehicle load analysis vehicle" (FABEAN) is assembled. Fitted out with corresponding trim weights and various different engines and axles, FABEAN can simulate either a BMW 7 Series model or a MINI, and this long before the first prototypes become available. FABEAN determines the stresses that arise during a journey, and in addition verifies the calculated load forecasts. Both the component design requirements and the drive data for the engineering strength trials to be carried out on the test benches are then derived on the basis of this measuring data.[8]

63.     In addition, BMW subjects safety components to special testing:

> The authorization of safety components, however, is always subject to the testing of their engineering strength in actual trials. These trials require special system and component test benches that can replicate the complex load conditions of road loads. Using special iteration software, the steering of the test benches is progressively optimized until the loads generated in the axle and body components equal those of the vehicle. An example of a complex system test bench is the multi-component test bench for vehicle bodies. As Professor Stauber explains: "Using specific steering programs, the test bench, in approximately three weeks, generates loads that correspond to a normal road load of more than 300,000 kilometers.[9]

64.     Specifically, Professor Stauber acknowledged that over the last 40 years:

"Naturally a lot has changed during this time, and with cars becoming increasingly lighter and continuous technological improvements, engineering strength too has increased in importance and will remain one of the most important areas within vehicle development in the future."

---

[8] *Id.*
[9] *Id.*

65.     Through their quality control measures, Defendants knew or should have known of the Defect.

## 2. __Complaints by Other Class Members__

66.     Plaintiff's experiences are by no means isolated or outlying occurrences. Indeed, the internet is replete with examples of blogs and other websites where consumers have complained of the exact same Defect in the Class Vehicles.[10]

67.     The Office of Defects Investigation within NHTSA conducts defect investigations and administers safety recalls to support NHTSA's mission to improve safety on the Nation's highways.[11] All vehicle manufacturers, including Defendants, are legally obligated to routinely monitor and analyze NHTSA complaints in order to determine whether vehicles or automotive components should be recalled due to safety concerns, and Defendants thus have knowledge of any and all NHTSA complaints. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

68.     The following is just a small sampling of the many complaints submitted to NHTSA by Class Vehicle owners. These publicly available complaints evidence Defendants' knowledge

---

[10] *See*, *e.g.*, https://g05.bimmerpost.com/forums/showthread.php?t=1598030 (last visited June 7, 2024); https://x3.xbimmers.com/forums/showthread.php?t=1971312  (last visited June 7, 2024); https://f90.bimmerpost.com/forums/showthread.php?t=1959644 (last visited June 7, 2024); https://x3.xbimmers.com/forums/showthread.php?t=1499908 (last visited June 7, 2024); https://www.bimmerfest.com/threads/water-leak-from-the-shark-fin-compensation.965857/ (last visited June 7, 2024); https://forums.bimmerforums.com/forum/showthread.php?908036-Water-Leak-from-roof (last visited June 7, 2024); https://www.bimmerforums.com/forum/showthread.php?2483289-Antenna-Leaks-leading-to-TCB-Module-Damage (last visited June 7, 2024); https://www.reddit.com/r/BMWX3/comments/11cr0ip/what_seems_to_be_the_cause_of_this_leak_f25/ (last visited June 7, 2024); https://www.reddit.com/r/BmwTech/comments/18wvh4t/emergency_system_failure/ (last visited June 7, 2024).

[11] *See* https://one.nhtsa.gov/nhtsa/announce/testimony/tread.html (last visited May 29, 2024). Vehicle manufacturers are required by law to report any potential safety defects to the United States government.

of the Defect, the negative experiences encountered by Class Members, and the financial burden

this places on them.[12]

**NHTSA ID Number**: 11587909
**Incident Date** May 9, 2024
**Complaint Date** May 9, 2024
**Consumer Location** FARGO, ND
**Vehicle Identification Number** 5UXCR6C01L9****
**Summary of Complaint**
My 2020 BMW X5 is having the same issues as SIB651222 based on the extensive troubleshooting that I have done with the telematics system. ALL of the exact symptoms can be found in this YouTube video for an X7: [XXX] . INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6).

**NHTSA ID Number:** 11582582
**Incident Date** April 5, 2024
**Complaint Date** April 12, 2024
**Consumer Location** HUNTINGTON, NY
**Vehicle Identification Number** 5UXCR6C54KL****
**Summary of Complaint**
The contact owns a 2019 BMW X5. The contact stated that the vehicle was communicating with the SOS department while no incident had occurred. The vehicle was taken to the dealer, where it was determined that a water leak in the rear antenna of the vehicle had caused the electronic malfunction. The vehicle was repaired. The manufacturer was notified of the failure, but no assistance was provided. The failure mileage was approximately 44,500.

**NHTSA ID Number:** 11577474
**Incident Date** March 14, 2024
**Complaint Date** March 14, 2024
**Consumer Location** PORTLAND, OR
**Vehicle Identification Number** 5UXCR6C58KL****
**Summary of Complaint**
After receiving a very expensive repair quote, I looked on here and read multiple complaints of emergency call system malfunction causing gps not to work/ malfunction due to leaking in the shark fin. This is a major safety concern due to poor design and build quality of the vehicle.

**NHTSA ID Number:** 11576340
**Incident Date** March 7, 2024
**Complaint Date** March 9, 2024
**Consumer Location** LONG GROVE, IL
**Vehicle Identification Number** 5UXCW2C08L9****
**Summary of Complaint**

---

[12] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

Emergency call system malfunction error on the dash. The SOS system is not working nor the GPS or any associated ContactedDrive services as the Internet is failed too. This is dangerous to have nonworking SOS in case of an emergency. THIS IS A KNOWN ISSUE ON X7 but yet no recall from BMW. The reason of this failure is believed to be faulty installation of shark fin antenna from the BMW factory. Its not sealed properly and water can get inside damaging the TCB unit (corroded or shorted the pcba ) This repair is costing users estimated $3k-$4k if car is just out side of warranty. I believe thousands are affected by this fault that originated at BMW's factory. I believe in you to do the right thing. Please help. I cannot afford this expensive repair. Expecting - BMW should issue a voluntary recall or at the very least conduct the repair on my vehicle.

**NHTSA ID Number:** 11566226
**Incident Date** December 18, 2023
**Complaint Date** January 18, 2024
**Consumer Location** FORT MYERS, FL
**Vehicle Identification Number** 5UXCR6C5XKL****
**Summary of Complaint**
On the date below, a warning banner and chime signaled that our car's emergency communication system was not functional. Soon after, we noticed that the navigation system was "lost"; ie, showing our car in a different state, sometimes in water, incorrect displays of speed limits being shown, etc. Vehicle was evaluated at a BMW dealership, and the primary defective part was found to be the "sharkfin" on the roof. Water entered the roof structure (not the interior of the car) via this sharkfin, and resulted in damage to the TCB, which reportedly controls many of the car's more-advanced electrical functions. Due to unfortunate clauses in warrantees on the car--both BMW certified pre-owned coverage, and also a 3rd party service contract that was purchased at the time of purchase, from the BMW dealer, as a bumper-to-bumper "platinum" supplement to the certified pre-owned warranty, are currently in effect for this car--this defect is NOT covered. Cost to repair all involvedf parts is approximately $5,000. As a consequence of this expense, it has not been repaired, and likely will not be in the near future. A Google search about this issue yielded numerous identical incidents involving this same model/year of BMW. Several owners wondered if a recall was needed, since it is clearly a manufacturer defect with clear-cut and repeated ramifications, is very costly to repair (so is likely to NOT be repaired, in many instances), and is subject to a loophole in warranty coverage. My impression from this internet search is that other systems in the car might soon stop working. I believe it is a safety issue, now, given the failure of the emergency communication function controlled by the TCB, and might become more of an issue in the future, when/if additional functions fail.

**NHTSA ID Number:** 11566233
**Incident Date** April 7, 2023
**Complaint Date** January 18, 2024
**Consumer Location** Unknown
**Vehicle Identification Number** WBA8A3C55JA****
**Summary of Complaint**
The electrical call system malfunctions. I've done extensive research and actually confirmed with Garret today at A&L BMW that there is a problem in the manufacturing of the shark fin. The gasket that BMW uses does not hole up and the sealant does not keep water from leaking

into the fin. Every time it rains/snows or the vehicle is wet the system malfunctions. Currently it only has the ability to affect me if I were in a wreck and won't notify emergency services. This has the ability to shut down all electrical functions in my car and has been a common issue in BMW dating back as far as 2015. I called them in April to have it looked at, but I didn't understand the problem and it had ceased. But since the weather has now began to be more frequently wet, this problem has become more persistent. Now they won't cover because the final warranty expired in December of 2023. This should be recalled because it is a manufacturing issue.

**NHTSA ID Number:** 11565427
**Incident Date** September 1, 2023
**Complaint Date** January 14, 2024
**Consumer Location** GULF SHORES, AL
**Vehicle Identification Number** WBXHU7C53K3****
**Summary of Complaint**
Emergency call (SOS) system is malfunctioning. This prevents the vehicle from communicating if an accident happens. BMW service stated the problem could be caused by water leaking on to the telematics control unit from the shark fin antenna, which would require replacing the unit. The TCU is located under the head liner beneath the shark fin. The head liner has to be removed to diagnosis and replace the TCU. This is poor engineering placement makes the fix difficult and very costly. The life saving feature is compromised!

**NHTSA ID Number:** 11554732
**Incident Date** August 15, 2023
**Complaint Date** November 12, 2023
**Consumer Location** Unknown
**Vehicle Identification Number** 5UXCR6C59KL****
**Summary of Complaint**
Seems I have read multiple complaints of emergency call system malfunction causing gps not to work/ malfunction due to leaking in the shark fin. This is a major safety concern due to poor design and build quality of the vehicle. This concern should be up most important that this area is recalled, replaced, and sealed to ensure safety for all.

**NHTSA ID Number:** 11548637
**Incident Date** October 2, 2023
**Complaint Date** October 6, 2023
**Consumer Location** JACKSONVILLE BEACH, FL
**Vehicle Identification Number** 5UXCW2C51KL****
**Summary of Complaint**
This is in regard to the shark fin roof mounted antenna leaking. It causes issues with the SOS feature, navigation (reporting wrong location). You report that BMW SIB 65 12 22 includes any vehicle paint application produced prior to the date of Jan 10, 2022. You have another complaint on 12-16-22 ID number 11498616. There are numerous complaints on message boards with the same problem. BMW is claiming that the SIB listed above does not include my vehicle and is refusing to fix it under warranty. This is a safety issue as the vehicle reports you in the wrong location on the navigation, giving you incorrect navigation directions.

**NHTSA ID Number:** 11543116
**Incident Date** August 18, 2023
**Complaint Date** September 7, 2023
**Consumer Location** DUMFRIES, VA
**Vehicle Identification Number** 5UXCR6C5XKL****
**Summary of Complaint**
TELEMATICS CONTROL UNIT HAS FAILED AND HAS WATER INGRESS. THIS
CAUSES THE ONBOARD EMERGENCY SOS SYSTEM TO FAIL AND NOT WORK,
MAKE FALSE CALLS AND RISK A DRIVER ABILITY TO MAKE AN EMERGENCY
CALL OR FOR THE VEHICLE TO CALL FOR HELP. THIS ALSO POSES A RISK IN
THAT WATER SEEPS INTO THE INTERIOR OF THE CARS SHELL THROUGH THE
ANTENNA. CREATING RUST, MOLD AND DECAY. WHICH WILL EVENTUALLY
AFFECT THE INTERIOR OF THE VEHICLE, HEAD LINER AND EVENTUALLY
PASSENGERS THROUGH ENVIRONMENTAL FACTORS. THE CAR EVENTUALLY
HAS TO BE GARAGED OR COVERED AT ALL TIMES IN EVENT OF RAIN OR SNOW.
THIS HAS BEEN SEEN WIRH OWNERS OF THIS PARTICULAR MAKE, MODEL, YEAR
SERIES. UNFORTUNATELY, MORE PEOPLE HAS YET TO EXPERIENCE THIS ISSUE IF
THEOR VEHICLE IS ALWAYS GARAGED OR COVERED

**NHTSA ID Number:** 11522038
**Incident Date** April 30, 2023
**Complaint Date** May 15, 2023
**Consumer Location** Unknown
**Vehicle Identification Number** 5UXTR9C53KL****
**Summary of Complaint**
I am writing about the BMW Telematics Control Unit (TCB). This is a safety device installed on
all BMWs for the past 6 years or more. It is an electronic tracking and communication device
that is activated either automatically on manually in the event of an emergency. For minor
emergencies such as a flat tire or running out of gas, the driver can call for roadside assistance.
For serious emergencies such as accidents the system automatically contacts the BMW
emergency center who contacts local emergency assistance providers such as police, fire,
ambulance. The system provides information such as the vehicle's exact location and the severity
of the accident. Obviously, this can be lifesaving information. I have no way to determine how
frequently these systems fail, but judging from the countless number of accounts described on
the internet and the number of YouTube videos I see, it would appear that these systems are very
unreliable. These systems fail for a number of different reasons and are very expensive to repair.
This is a serious safety issue. In my own case, water had leaked through the roof aerial and
damaged the electronic communication device rendering it useless. Cost of repair would be
nearly $3,000. There is at least one BMW Technical Service Bulletin (TSB) that applies to this
issue for my vehicle. It is number B651222. There are probably many other TSB's that apply to
other models and other causes of failure of this device. BMW owners have spent a lot of money
for this device with the expectation of providing themselves with some additional safety in the
event of an emergency. This is largely a false sense of security because these devices are very
unreliable. I respectly request the the NHTSA look in to this issue. I believe that there are many
people that are unknowingly in a dangerous situation.

**NHTSA ID Number:** 11498616
**Incident Date** December 16, 2022
**Complaint Date** December 22, 2022
**Consumer Location** LAKELAND, FL
**Vehicle Identification Number** 5UXCX4C52KL\*\*\*\*
**Summary of Complaint**
The SOS malfunctions by disabling the center display panel. The satellite radio and navigation don't work. An error message populates the main dash display and cannot be reset by driver. The SOS device box is located in the rear overhead panel where it's very difficult to access. The dealer replaced the SOS box and Li battery. After 3 weeks, the SOS malfunctions again where it randomly calls the BMW roadside assistance every few minutes. During this time, the center display screen functions are gone and replaced by a calling SOS message and all functions are inoperable. This time dealer says the rear antennae fins has water intrusion which corroded the "electrical fins." They replaced this part. Bottom line: the most important part of the vehicle should be the most reliable part. This device should never break and water definitely should not enter the rear antenna and corrode the electrical contacts. A major safety risk and Very poor design in my opinion. Thank you for investigating this problem.

**NHTSA ID Number**: 11456456
**Incident Date** March 12, 2022
**Complaint Date** March 12, 2022
**Consumer Location** SIMPSONVILLE, SC
**Vehicle Identification Number** 5UXTR7C53KL\*\*\*\*
**Summary of Complaint**
The car sos system "masses a dos call" to the police department. After clsryfiyng the error, the car shows the following message: " emergency call malfunction". BMW disabled my car emergency system to avoid this problem again but tried to change me to fix the problem.

**NHTSA ID Number**: 11456014
**Incident Date** March 8, 2022
**Complaint Date** March 10, 2022
**Consumer Location** KENSINGTON, CA
**Vehicle Identification Number** 5UXTA6C0XM9\*\*\*\*
**Summary of Complaint**
Car has an emergency call system in case of a crash. The dashboard shows a malfunction that flashes every few minutes. Call to dealer for a repair was not considered a safety hazard and was scheduled for the next month.

### 3.  **BMW SIB 65 12 22**

69.     BMW's knowledge of the Defect is also evidenced by its issuance of a service

action related to the Defect.

70. On October 5, 2022, BMW issued SIB 65 15 22 (hereafter, the "SIB"), titled "ROOF-MOUNTED ANTENNA HOUSING SEAL NOT ADHERING." *See* Exhibit 1.

71. The SIB applies to the BMW X3 Sports Activity Vehicle, X4 Sports Activity Coupe, X5 Sports Activity Vehicle, X6 Sports Activity Coupe, and X7 Sports Activity Vehicle and applies to vehicles produced from SOP (Start of Production) to January 10, 2022.

72. The SIB states that the "seal of the roof-mounted antenna housing is separating from the vehicle. This can allow water ingress into the vehicle, possibly damaging components and equipment."

73. The SIB states the cause of the problem is the "[p]aint application process for the roof-mounted antenna housing was not optimal *during construction* of vehicle." (emphasis added).

74. Upon information and belief, Defendants did not alert owners and lessees of the Class Vehicles to this SIB. Further, the SIB fails to meaningfully address the slew of problems owners and lessees have encountered as a result of the Defect, including having to pay for repairs, even after the issuance of the SIB,[13] refusing to provide reimbursement for prior repairs,[14] and

---

[13] *See, e.g.*, NHTSA ID Number 11576340, *supra*.

[14] *See, e.g.*, NHTSA ID Number 11582582, *supra*. *See also* https://g05.bimmerpost.com/forums/showthread.php?t=1598030 (last visited June 5, 2024) ("2019 X5, 4.5 years, 37 K miles, Emergency Call System Malfunction warning, dealer repair, $3,000, TCM module + antenna. Dealer would not consider any cost concession and actually marked up parts 37% over BMW MSRP. Called dealer to complain on mark-up, response was MSRP is a suggested price and all of the dealerships under their ownership have over MSRP parts mark-ups. Like saying you should feel better because we ripoff all our customers. **Submitted claim to BMW NA while car at dealership after issue diagnosed. BMW NA called back 5 days later, after car was repaired, refused to evaluate the issue since I had already pair for the repair.** BMW NA process makes it all but impossible to even have your claim evaluated. This is my 6th BMW, didn't move the needle with local BMW or BMW NA.") (emphasis added)

improperly excluding certain BMW vehicles from the SIB, even though said vehicles also contain the Defect.[15]

75.    Owners and lessees of the Class Vehicles have also reported that BMW's authorized dealerships repair and/or replace the defective sealing with equally defective sealing that may inevitably fail again:[16]

> I had the same issue but bmw dealer didn't go through with the repair (even tho they kept the car for 3 days) bc they 'couldn't replicate the issue after they reset the software.' ***The service advisor also said while I was picking up the car, that the issue will most likely come up again***, but they just need to show live repro so they can get it covered under warranty. (emphasis added)

76.    BMW has not issued an updated SIB to include all Class Vehicles, increase the range of production, or offer reimbursements for prior repairs, or a warranty extension.

### 4.    Complaints on Heavily Trafficked Internet Forums for Car Owners Should Have Given BMW Knowledge of the Defect

77.    Consumer complaints regarding the Sealing Defect are present on numerous websites devoted to automotive reviews, automobile repairs, car complaints, and the Class Vehicles specifically. Over the last several years, hundreds of comments have been published on these sites in response to posts related to water infiltration issues as a result of defective sealing in the shark fin antenna.

78.    On a forum entitled "Leaking Sharkfin Antenna,"[17] numerous owners and/or lessees of BMW X3 vehicles wrote about the Sealing Defect. One user wrote: "A week after purchasing it I received the dreaded "Emergency Call System Malfunction" message. I took it to the dealer and they said it was from water leaking around the shark fin antenna. The bill came out

---

[15] *See* NHTSA ID Number 11548637, *supra.*

[16] https://g05.bimmerpost.com/forums/showthread.php?t=1598030 (last visited June 4, 2024).

[17] https://url.usb.m.mimecastprotect.com/s/r2-UCwn680fGOyycV7xC-?domain=x3.xbimmers.com (last visited June 5, 2024)

to just over $2k to repair it." Another user commented: "Exact same issue just happened today with our 2019 x3. But it's keep calling the emergency call center hang up after hang up. Just washed the car at home." One user commented that the Defect manifests shortly after heavy rainfall.[18]

79.    Another forum for X3 owners contains additional complaints about the Defect. One user wrote: "Had this issue on my 2019 X3. Our CPO did not cover the issue and they quoted us nearly $3000 to fix it."[19] Another user shared his experience with a BMW dealer related to the Defect: "Was told that water leaked through the shark fin (due to bad seal) and got to wires/fuses + the TCU & TCU battery. Wires, fuses, TCU, and TCU battery will all need to be replaced."[20]

80.    Owners and lessees have also complained about the lengthy delays in obtaining the necessary parts to address the Defect:[21]

> Dealer checked for water because it was repaired a month ago - found a small leak around the epoxy. Told it WILL be covered under warrantee because it was found "the antenna was not properly sealed". New antenna and sealant should be done by next Wed. ( dropped car off on Thursdays). BUT new TCU needs to come from Germany, told 1-2 months wait. They want the loaner back when the antenna is replace and then come back when the TCU comes in.

81.    Owners and lessees of X5 vehicles have similarly complained about the Defect and their experiences.[22] One user wrote about his experience, including the symptoms of the Defect, the diagnosis made by BMW's authorized dealership, and the costs to repair the Defect:

---

[18] https://www.reddit.com/r/BmwTech/comments/16uvcu4/bmw_x3_emergency_call_system_failure/  (last visited June 5, 2024)

[19] https://g07.bimmerpost.com/forums/showthread.php?t=2089160 (last visited June 5, 2024)

[20] https://x3.xbimmers.com/forums/showthread.php?t=1983344 (last visited June 5, 2024)

[21] https://x3.xbimmers.com/forums/showthread.php?t=1499908&page=3 (last visited June 5, 2024)

[22] *See* https://g05.bimmerpost.com/forums/showthread.php?t=1972363 (last visited June 5, 2024); https://g05.bimmerpost.com/forums/showthread.php?t=1598030&page=3 (last visited June 5, 2024); https://g05.bimmerpost.com/forums/showthread.php?t=1849015 (last visited June 5, 2024); https://g05.bimmerpost.com/forums/showthread.php?t=2078042 (last visited June 5,

I have a 2019 X5 with 39000 miles on it. My X5 is normal parked in my garage, but this week, I left it out in my driveway for 2 days. It rained for the 2 days straight my car was outside. When I went to drive it to a doctor's appointment, my car started initiating SOS calls to the contact center non-stop. I spoke to no less than 6 reps, explaining there was no emergency. I could not turn off the calls and the call center reps could not do it either. Shutting off my engine did not help. The car continued calling for help. The call center reps told me I had to take my car into a BMW service center. Fortunately, the calls had stopped by the time I came out of my doctor's appt, but now Emergency Call System Malfunction alert kept flashing. What did BMW Service tell me?

CAUSE: Found water leaking into headliner on top of the telematics control unit

CORRECTION: Replace shark fin, antenna, telematics control unit, battery and program

Incidentally, my car just got off warranty. This is going to cost $$$. There have apparently been more of the same bad seals and water leakage issues with other X5s and X7s. However, there's no recall. My service advisor told me there is another issue with the cup holders. Apparently water from condensation on cups seeping into the cup holders may cause warning lights to come on. There's a class action lawsuit. BMW hasn't admitted to any wrong doing, but my service advisor told me if that were to happen to my car, they would repair it for free. Great. Can't wait for that to happen. BMW Service will have my car for at least a week as they wait for parts to arrive to replace the shark fin, antenna, telematics board etc.

82.     Additionally, owners and lessees of X7 vehicles have similarly posted comments about their experiences with the Defect,[23] including the symptoms of the Defect once it manifests,[24] as well as the out of pocket expenses they incurred as a result of the Defect.[25]

---

2024); https://www.reddit.com/r/BMWX5/comments/x6138c/emergency_call_system_malfunction/ (last visited June 5, 2024)

[23] *See* https://g07.bimmerpost.com/forums/showthread.php?t=1899167 (last visited June 5, 2024); https://g07.bimmerpost.com/forums/showthread.php?t=1804115 (last visited June 5, 2024); https://g07.bimmerpost.com/forums/showthread.php?t=2070128 (last visited June 5, 2024)

[24] https://g07.bimmerpost.com/forums/showthread.php?t=1836275 (last visited June 5, 2024); https://www.youtube.com/watch?v=z342dcegD5U (last visited June 5, 2024)

[25] https://x3.xbimmers.com/forums/showthread.php?t=1971312 (last visited June 5, 2024)

**D. <u>Defendants' Warranty Practices</u>**

83.     Despite longstanding knowledge of the Defect as set forth above, Defendants refuse to provide warranty coverage for the repairs when the Defect manifests.

84.     Defendants provide a 4-year/50,000-mile (whichever occurs first) New Vehicle Limited Warranty ("NVLW"). The warranty states "BMW of North America, LLC (BMW NA) warrants during the Warranty Period the 2019 U.S.- specification BMW vehicles distributed by BMW NA or sold through the BMW NA European Delivery Program against defects in materials or workmanship to the first retail purchaser, and each subsequent purchaser." A copy of the NVLW is attached hereto as Exhibit 2.

85.     Nevertheless, when Class members seek warranty coverage for the Defect, even within the warranty period, Defendants often fail to respond or deny warranty coverage.

86.     Moreover, some Class Vehicles manifest the Defect just outside Defendants' warranty period. But the mileage and temporal limitations Defendants impose on their warranty are unconscionable and unenforceable.

87.     Defendants provide this New Vehicle Limited Warranty to buyers after a purchase is complete. Buyers like Plaintiff and Class members lack pre-sale knowledge of the Defect or the ability to bargain as to the terms of the Defendants' warranty. Accordingly, the limitations Defendants impose on the Limited Warranty—and their efforts to disclaim any implied warranties—are procedurally unconscionable because there was unequal bargaining power between Defendants and Plaintiff and the Class members, as, at the time of purchase, Plaintiff and the other Class members had no other options for purchasing from Defendants alternative warranty coverage for the Class Vehicles.

88.     All of the purported limitations on the warranty, including the time and mileage limits, are also substantively unconscionable. Defendants knew Class Vehicles suffered from the Defect and that the Defect would continue to pose safety risks after the warranty purportedly expired, yet failed to disclose the Defect to Plaintiff and the other Class members while continuing to market Class Vehicles as safe and reliable. Defendants' enforcement of those limitations is thus harsh and shocks the conscience.

89.     Defendants' efforts to evade their warranty obligations with respect to the known Defect, coupled with their refusal to cover the Defect if it manifests outside the warranty's stated term, deprives Plaintiff and Class members of the benefit of their bargain, forcing them to pay out of pocket to repair a defect present in Class Vehicles at the time of purchase.

## CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this action on behalf of himself, and on behalf of the following class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the proposed class is defined as follows:

**California Class:**

All persons or entities who are: (1) current or former owners and/or lessees of a Class Vehicle; and (2) reside in California and purchased a Class Vehicle for primarily personal, family or household purposes, as defined by California Civil Code § 1791(a), in California.

91.     Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Class definitions after conducting discovery.

92.    <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes that hundreds of thousands of Class Vehicles have been sold and leased throughout the United States, including tens of thousands within California.

93.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

    a.   whether the Class Vehicles are predisposed to the Defect;

    b.   whether Defendants knowingly failed to disclose the existence and cause of the Defect;

    c.   when Defendants first learned of the Defect;

    d.   whether Defendants' conduct constitutes a violation of the California consumer protection statutes asserted herein;

    e.   whether Defendants' conduct violates the Magnuson-Moss Warranty Act;

    f.   whether Defendants' conduct constitutes a breach of express warranty;

    g.   whether Defendants' conduct constitutes a breach of implied warranty;

    h.   whether Defendants' conduct constitutes common law fraud;

    i.   whether Defendants' conduct constitutes unjust enrichment; and

    j.   whether Plaintiff and the Class members are entitled to monetary damages and/or other remedies and, if so, the nature of any such relief.

94.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Class since Plaintiff and each member of the Class purchased or leased a Class Vehicle with the Defect. Furthermore, Plaintiff and all members of the Class sustained monetary and economic injuries including, but not

limited to, ascertainable loss arising out of Defendants' wrongful conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent Class members.

95. <u>Adequacy</u>: Plaintiff is an adequate representative because his interests do not conflict with the interests of the Class that he seeks to represent, he has retained counsel that are competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

96. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually and effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers (VINs), warranty claims, registration records, and the database of complaints.

97. <u>Injunctive Relief</u>: Pursuant to Fed. R. Civ. P. 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final

injunctive relief, corresponding declaratory relief, or final equitable relief with respect to the class as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA")**
**(Cal. Civ. Code § 1750, *et seq.*)**
**(On Behalf of the California Class)**

98.     Plaintiff Craft and the California Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

99.     Plaintiff Craft brings this claim on behalf of himself and on behalf of the California Class against Defendants.

100.     Defendants are persons as that term is defined in California Civil Code § 1761(c).

101.     Plaintiff Craft and the California Class Members are "consumers" as that term is defined in California Civil Code §1761(d).

102.     Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiff Craft and the California Class that the Class Vehicles suffer from the Defect (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

> (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;
>
> (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;
>
> (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and
>
> (a)(9) Advertising goods and services with the intent not to sell them as advertised.

103.   Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

104.   Defendants knew that the Class Vehicles were defectively manufactured, would fail prematurely, and were not suitable for their intended use.

105.   Defendants were under a duty to Plaintiff Craft and the California Class to disclose the defective nature of the Class Vehicles because:

   a.   Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles;

   b.   Plaintiff Craft and the California Class could not reasonably have been expected to learn or discover that the Class Vehicles had a dangerous safety defect until manifestation of the Defect;

   c.   Defendants knew that Plaintiff Craft and the California Class could not reasonably have been expected to learn or discover the safety defect and the associated repair costs that it causes until the manifestation of the Defect; and

   d.   Defendants actively concealed the safety defect and the associated repair costs by asserting to Plaintiff Craft and the California Class that their vehicles were not defective.

106.   In failing to disclose the Defect and the associated safety risks and repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty to disclose.

107.   The facts concealed or not disclosed by Defendants to Plaintiff Craft and the California Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price. Had Plaintiff Craft and the Class known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

108.   On May 30, 2024, Plaintiff Craft provided Defendants with notice of their violations of the CLRA pursuant to California Civil Code § 1782(a) and seeks only injunctive relief at this time. After the 30-day notice period expires, Plaintiff Craft will amend this Complaint to seek monetary damages under the CLRA.

109.   Plaintiff Craft and the other California Class members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

110.   Therefore, Plaintiff Craft and the California Class seek all relief available under the CLRA.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200)
### (On Behalf of the California Class)

111.   Plaintiff Craft and the California Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

112.   Plaintiff Craft brings this claim on behalf of himself and on behalf of the California Class against Defendants.

113.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

114.   Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff Craft and the California Class that the Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems). Defendants should have disclosed this information because they were in a

superior position to know the true facts related to the Defect, and Plaintiff Craft and the California Class could not reasonably be expected to learn or discover the true facts related to the Defect.

115.    The defective sealing constitutes a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

116.    These acts and practices have deceived Plaintiff Craft and are likely to deceive the public. In failing to disclose the Defect and suppressing other material facts from Plaintiff Craft and the California Class, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiff Craft and the Class. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff Craft and the Class, as it would have been to all reasonable consumers.

117.    The injuries suffered by Plaintiff Craft and the California Class are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff Craft and the Class should have reasonably avoided.

118.    Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

119.    Plaintiff Craft seeks to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

**THIRD CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**
**(Cal. Bus. & Prof. Code § 17500, et seq.)**
**(On Behalf of the California Class)**

120.    Plaintiff Craft and the California Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

121.    Plaintiff Craft brings this claim on behalf of himself and on behalf of the California Class against Defendants.

122.    California Business & Professions Code § 17500 states:

It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

123.    Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff Craft and the California Class.

124.    Defendants have violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

125.    Plaintiff Craft and the California Class have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiff Craft and the other California Class members relied on Defendants' misrepresentations and/or omissions with respect to the safety and reliability of the Class Vehicles. Defendants' representations were untrue because the Class Vehicles are distributed with defective sealing that can cause the emergency call system to malfunction and fail. Had Plaintiff Craft and the California Class known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, Plaintiff Craft

and the California Class overpaid for their Class Vehicles and did not receive the benefit of their bargain.

126.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

127.    Plaintiff Craft, individually and on behalf of the California Class, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT -**
**BREACH OF EXPRESS WARRANTY**
**(Cal. Civ. Code §§ 1791.2 & 1793.2(d))**
**(On Behalf of the California Class)**

128.    Plaintiff Craft and the California Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

129.    Plaintiff Craft brings this claim on behalf of himself and on behalf of the California Class against Defendants.

130.    Plaintiff Craft and the California Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

131.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

132.    Defendants are "manufacturers" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

133.    Defendants made express warranties to Plaintiff and the Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

134.    Plaintiff Craft and the California Class members have requested repairs of the Defect pursuant to the express warranty but have failed to receive such repairs at no cost.

135.    Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, Plaintiff Craft and the California Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

136.    Pursuant to Cal. Civ. Code § 1794, Plaintiff Craft and the California Class members are entitled to costs and attorneys' fees.

## FIFTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
**(On Behalf of the Nationwide Class Or, Alternatively, the State Class)**

137.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

138.    Plaintiff Craft brings this claim on behalf of himself and on behalf of the California Class against Defendants.

139.    Defendants provided Plaintiff and Class members with the express warranty set forth above.

140.    Specifically, Defendants warranted that the Class Vehicles were free from defects in materials or workmanship; and that in the event the Class Vehicles suffered from defects in either of these respects, Defendants would correct such defects at no cost to Plaintiff or the Class.

141.    The Class Vehicles were not free from defects in materials or workmanship because they suffer from the Defect.

142.    Defendants have refused, and continue to refuse, to comply with the terms of their warranty to correct the Defect outlined above at no cost.

143.    Plaintiff has complied with his obligations under the express warranty at all times relevant herein.

144.    As a result of Defendants' breach of express warranty, Plaintiff and the Class members have suffered damages.

145.    Defendants' conduct was done knowingly, wantonly, maliciously, and/or in conscious disregard for the rights of Plaintiff and the California Class, justifying the imposition of punitive damages.

**SIXTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**(On Behalf of the Nationwide Class Or, Alternatively, the State Classes)**

146.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

147.    Plaintiff Craft brings this claim on behalf of himself and on behalf of the California Class against Defendants.

148.    Defendants were at all relevant times the manufacturers, distributors, warrantors, and/or sellers of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

149.    Defendants provided Plaintiff and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary

purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles suffer from the Defect, which causes failure of vital emergency systems including the emergency call system. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

150.     Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not experience failure of electrical equipment for vital emergency systems; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

151.     Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the other Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from the Defect.

152.     Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, *et seq.*)**
**(On Behalf of the Nationwide Class Or, Alternatively, the State Class)**

153.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

154.     Plaintiff Craft brings this claim on behalf of himself and on behalf of the California Class against Defendants.

155.    Plaintiff and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

156.    Defendants are suppliers and warrantors within the meaning of 15 U.S.C. §§ 2301(4)-(5).

157.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

158.    The warranties described above are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

159.    Defendants breached the express warranties by:

   a.  Providing warranties with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

   b.  Selling and leasing Class Vehicles that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

   c.  Refusing and/or failing to honor the express warranties by repairing or replacing, free of charge, the component parts in order to remedy the Defect.

160.    Plaintiff and the other Class Members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

161.    Defendants breached their implied warranties by selling Class Vehicles that are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles suffer from the Defect, which causes failure of vital emergency systems including the emergency call system.

162.    Defendants' breach of the express and implied warranties has deprived Plaintiff and the other Class Members of the benefit of their bargain.

163.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value

of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

164.    Defendants have been afforded a reasonable opportunity to cure their breach of the warranties and/or Plaintiff and the other Class members were not required to do so because affording Defendants a reasonable opportunity to cure their breach of warranties would have been futile. Defendants were also on notice of the alleged Defect from the complaints and service requests it received from Class members, as well as from their own warranty claims, customer complaint data, and/or parts sales data.

165.    As a direct and proximate cause of Defendants' breach of the warranties, Plaintiff and the Class members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiff and the other Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

**EIGHTH CAUSE OF ACTION**
**COMMON LAW FRAUD**
**(On Behalf of the Nationwide Class Or, Alternatively, the State Class)**

166.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

167.    Plaintiff Craft brings this claim on behalf of himself and on behalf of the California Class against Defendants.

168.    Defendants made material omissions concerning a presently existing or past fact. For example, Defendants did not fully and truthfully disclose to their customers the true nature of the Defect, which was not readily discoverable until years later, often after warranty period

expired. As a result, Plaintiff and the Class members were fraudulently induced to lease and/or purchase the Class Vehicles with the said Defect and all of the resultant problems.

169.    These omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiff and the Class members rely on them.

170.    Plaintiff and the Class members reasonably relied on these omissions and suffered damages as a result.

**NINTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of the Nationwide Class Or, Alternatively, the State Class)**

171.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

172.    Plaintiff Craft brings this claim on behalf of himself and on behalf of the California Class against Defendants.

173.    This claim is brought in the alternative to Plaintiff's contract-based claims.

174.    Plaintiff and members of the Class conferred a benefit on Defendants. Although Plaintiff and the Class purchased Class Vehicles from Defendants' authorized dealerships, the money Plaintiff used to purchase the Class Vehicles flowed from Defendants' authorized dealership to Defendants.

175.    Defendants had knowledge that this benefit was conferred upon them.

176.    Defendants have been and continue to be unjustly enriched at the expense of Plaintiff and the Class, and their retention of this benefit under the circumstances would be inequitable.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.    appoint Plaintiff as the representative of the Class and his counsel as Class Counsel;

C.    award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiff and Class members are entitled;

D.    award pre-judgment and post-judgment interest on such monetary relief;

E.    grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and the Class members with appropriate curative notice regarding the existence and cause of the defect; and to correct their advertising and marketing practices as described herein;

F.    award reasonable attorney's fees and costs; and

G.    grant such further relief that this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 7, 2024

Respectfully submitted,

*/s/ Matthew D. Schelkopf*
Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney

**SAUDER SCHELKOPF LLC**
1109 Lancaster Avenue
Berwyn, PA 19312
Tel: (610) 200-0581
Facsimile: 610-421-1326
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com

*Attorneys for Plaintiff and the putative Class*